CITIZENS AND SOUTHERN NATIONAL BANK *et al.,* executors, *v.* FLEMING *et al.,* executors.

No. 10475.  SEPTEMBER 21, 1935.

*Fleming & Fleming, Lee, Congdon & Fulcher,* and *Freeman C. McClure,* for plaintiffs.

*Cumming & Harper,* for defendants.

BECK, Presiding Justice. ʹThe corporation first referred to in the headnotes is Southern States Phosphate and Fertilizer Company. The second is Pope & Fleming Incorporated. There is no controversy as to the second check for regular periodic dividend

received from each. Defendants contend that the first check also from each corporation should have been credited to income, instead of to corpus as was done by the executors and trustees. The check in controversy from the fertilizer company was for $48,675. The one from Pope & Fleming Inc. was $45,000. Total of the two, $93,675. Doubt having arisen as to the proper application of these two checks, the executors and trustees filed this bill for direction and other relief. There were ad interim rulings on demurrers and other matters. On the trial the case was submitted to the court on agreed statements of fact. The final decree was that the $93,675 had been improperly treated as corpus of the estate, and should have been classed as income and disbursed accordingly. The plaintiffs excepted.

■ The principal question presented turns on a construction of the will of Porter Fleming, who died on February 13, 1926. After his death his estate was appraised at $793,292.64, and his holdings in the fertilizer company and in Pope & Fleming Inc. amounted to more than half the total value of the estate. The first-named stock was appraised at $175 per share, and the latter at $200. The disbursements now in question reduced these values to $150 and $100 respectively. Porter Fleming's will bequeathed his entire estate to the plaintiffs as executors and trustees, who were directed "to distribute the net income of my estate during the lifetime of my wife, Daisy Berry Fleming, as follows: 60 per cent. to my said wife; 20 per cent. to my son, Berry Fleming; and 20 per cent. to my daughter, Elizabeth Berry Boardman." At the death of the wife the trustees were directed to convey in fee simple to the son one half "of my estate remaining at that time," and to hold the other half in further trust for the daughter during her life, with remainder at her death to any child or children she might have. The will created no life-estate in the property itself. The full legal title was conveyed to the executor-trustees. Mrs. Fleming's beneficial interest was in 60 per cent. of the income, and during her life the beneficial interests of Berry Fleming and Mrs. Boardman also were in income only. The distributions here involved occurred after the death of Porter Fleming and before the death of his widow. The questions therefore are, were these distributions "income," or were they not? What did the testator mean to include in the word "income" when he used it in his

will? Did he mean it to cover any and all disbursements by the corporations, however much such disbursements might impair the asset value of the estate to be distributed at Mrs. Fleming's death? Or did he mean only the natural and normal disbursements, in the pursuit of a dividend policy for the future similar to that which had been observed in the past?

After careful consideration of the terms of the will and of the unusual nature of the payments by the companies, we think the latter supposition as to the testator's intent must be adopted. The will as a whole shows a preference for the testator's own blood line, a desire for adequate protection of his wife and children during the widow's life, and then a distribution, without serious or abnormal depletion of the capital value of the estate as it existed at the testator's death. It is obvious at once that should any other view be adopted, a heavy inroad would be made in the value of the corpus of his estate, and a serious diminution, during the wife's life, in what at her death would be left for his children. We do not believe he intended that. Illustrating what we have in mind, suppose these stocks, by reason of accumulated profits and conservative dividend policy, had been worth $1000 a share at the time of his death, and suppose that shortly thereafter the companies, through some fear of a threat of a heavy tax on undivided profits, or for other reason, had directed a disbursement of $900 per share out of surplus. Suppose the testator's estate had consisted of no investments other than these stocks. By such corporate action and the disbursement of the money under the income clause of the will, the corpus value of the estate would be cut to one tenth of its value at death, and that would be all the children could receive at termination of the widow's life. And the widow would have taken, without restriction, 60 per cent. of this corpus reduction. We can not believe the testator had in mind any serious diminution of asset value when he used the word "income." In considering the meaning of the word "income" as used in the will, we deem it unprofitable to look up the term in Words & Phrases or in law dictionaries. We think it unlikely that the testator so investigated judicial applications of the term before he used it. We think it most probable that he employed it in its common, ordinary meaning, and that his use of it did not contemplate such an extraordinary disbursement of surplus assets as

was later declared by the two corporations in point. These disbursements, if considered income, reduced the value of the corpus of his estate nearly $100,000.

In any case where a life-estate and remainder exist, and a dividend is declared on stock held by the estate, the question arises as to whether the dividend belongs to the life-tenant or should be regarded as corpus to be finally distributed to the remainderman. On the general subject the courts of the United States are in conflict. Two rules have arisen, one of them being usually referred to as the "Massachusetts rule," and the other the "Pennsylvania rule." For an interesting discussion of the two, see 14 C. J. 829-834. It is generally considered that Georgia has committed itself to the Massachusetts rule, and it has been stated that that is the substance of § 85-605 of the Code of 1933. This is an old section, and it appears in the first Code of Georgia in language in all essentials identical with that of the present Code. "The natural increase of the property shall belong to the tenant for life. Any extraordinary accumulation of the corpus—such as an issue of new stock upon the share of an incorporated company—shall attach to the corpus and go with it to the remainderman." But whatever be the divergent views of the several courts as to the general rules to be observed, it has been noted (14 C. J. 829) that they all agree on one proposition; they all expressly or impliedly recognize that the question whether a distribution made by a corporation during the existence of a life-estate is to be regarded as income or as capital is primarily one of construction, a question of the intention of the creator of the trust. And we may add that a consideration of this primary question must always be had in the light of the particular nature of the distribution in question and the circumstances under which it was made. We do not deem it necessary here to enter on an extended discussion of the Massachusetts and Pennsylvania rules. They have been before the courts in scores of cases, and have been elaborately treated in all the text-books on corporations. Our own court has on several occasions considered and contrasted them. See, as instances, *Jackson* v. *Maddox*, 136 *Ga.* 31 (70 S. E. 865, Ann. Cas. 1912B, 1216), and *McHenry* v. *McHenry*, 152 *Ga.* 105 (108 S. E. 522). We may grant that Georgia has pursued the policy of applying the Massachusetts rule to all cases which clearly presented the situation

covered by it. But to our minds the case at bar is not one of them.

It has often been said that as all wills differ, each is a law unto itself and must be construed according to its own terms. See *Cook* v. *Weaver,* 12 *Ga.* 47, 50; *Sumpter* v. *Carter,* 115 *Ga.* 893, 896 (42 S. E. 324, 60 L. R. A. 274); Smith v. Bell, 6 Peters, 68, 80 (8 L. ed. 322). Decisions in other cases are therefore rarely of controlling or even great importance. In any given case the question is not so much whether a rule adopted by one State is better than that adopted by another State, but rather what, under the terms of the particular will before us, would be the true intent of the testator as to the particular state of facts which has arisen? What are the facts here presented, and what are the terms of the will before us? It is clear that neither the distribution by the fertilizer company nor that of Pope & Fleming was a "dividend" as that term is ordinarily used. The payment from the fertilizer company was not even called a dividend, but was definitely stated as "a partial distribution of the surplus now in the treasury of the company, . . and heretofore treated as a part of the capital stock of the company." It was, then, a payment out of capital. Is it not clear that it should be classed as a stock dividend, even though paid in cash? The distribution by Pope & Fleming occupies the same legal status as that of the fertilizer company. There also the payment was to be as "a partial distribution of the surplus now in the treasury of the company, accumulated in years prior to the first day of March, 1926, and heretofore treated as a part of capital stock of the company." And the resolution added that it "was entirely independent of the usual annual dividend and separate from any dividend that may be declared out of earnings for the year" March, 1926-March, 1927. As the testator died on February 13, 1926, all the disbursement by the fertilizer company, and all except part of one month of that of Pope & Fleming, had been accumulated before his death. Is it not true, therefore, that at the date of his death he considered that his share of the accumulated and undivided profits of these concerns were parts of the corpus of his estate? And when in his will he directed the trustees "to distribute the net income of *my estate,*" did he not clearly mean to include only the *income,* and not any part of the corpus, of these corporate assets which at the time of his death had not been given to the stockholders but which were represented

in the then market value of the shares? And when he referred, in item 5, to the final distribution after his wife's death and used the phrase "my estate remaining at that time," did he not mean the estate as it existed at his death, subject to normal reductions by expenses, estate taxes, commissions, etc., or a possible decline in market value by reason of decreased business activity, but *not* subject to abnormal reduction such as would be occasioned by large corporate disbursements made out of capital and surplus and entirely out of line with periodic dividends declared in due course out of current earnings? Our conclusion is that that is the true meaning of the will before us. And we should perhaps add that a different conclusion is not required by the fact, as appears in the record, that the two extraordinary disbursements were not made in process of liquidation of the corporations. They are still active in business, and the payments made did not impair the capital of either below the amount required by its charter.

Stress is laid by counsel for defendants on *Millen* v. *Guerrard,* 67 *Ga.* 284 (44 Am. R. 720). In that case the will left certain railroad stock in trust, the income to be paid to a life-tenant. It was held that dividends, whether in cash or in certificates of indebtedness, were a part of the income and went to the life-tenant. Headnote 2: "Dividends, whether in cash or bonds or certificates of indebtedness, are the natural increase of stock, and not an accumulation of the corpus; nor is this affected by the fact that no dividends are declared on the stock for some time, and when they are declared the amount is unusually large. Therefore such dividends belong to the life-tenant and not to the remaindermen." The dividends involved in that case were declared on June 1, 1881. They consisted of a certificate of indebtedness for $40 a share by the Central Railroad and $32 by the Southwestern Railroad. In the decision they were treated as cash. It appears that during the general depression of 1873-1877 the Central had found it necessary to withhold all dividends, but as prosperity returned it was considered that these disbursements were justified. This court said: "These dividends could not be so used as to increase the corpus, and hence the directors declared the dividends, and gave them to the stockholders as dividends, and not as corpus." In the case at bar the resolution passed by the fertilizer company expressly stated that it was "a partial distribution of the surplus,

. . and heretofore treated as a part of the capital stock," and the recital by Pope & Fleming Inc. is to the same effect. As matter of fact these corporations did not treat the disbursements as "dividends," and they were not dividends as that word is commonly used. They are not at all a parallel to the payments which were before the court in *Millen* v. *Guerrard,* supra. Here both corporations, one on the same day, the other a little later, declared and paid "dividends," which were allotted to income account by the trustees. There is no doubt in our minds that the dividend check for $18,000 received from Pope & Fleming on March 8, 1927, is in a class fundamentally different from the check for $45,000 received on the same day from the same concern in pursuance of a resolution designating it as "a partial distribution of the surplus . . heretofore treated as part of the capital stock of the company." And the same difference exists in the two checks received from the fertilizer company, the one for $48,675 received May 17, 1926, and the other for $19,470 received July 2, 1926. No such state of affairs existed in *Millen* v. *Guerrard.* That case was decided squarely on its own facts, and nothing which appears in the decision not directly applicable to those facts is binding on us here. This court in that case left no doubt as to just what it was deciding. In the decision appears the statement: "No matter what, therefore, may be the law in respect to cases generally which may arise under this action of the directors of the Central Railroad Company, *in this case, under this will* [italics ours], these dividends, in the shape of these interest-bearing certificates, are income, and not corpus, and go to the life-tenant and not to the remaindermen,"—thus recognizing that each will is a law to itself.

While it is of interest to note that here all the disbursement made by the fertilizer company had been earned and accumulated prior to Porter Fleming's death, as was also all the disbursement of Pope & Fleming Inc., except possibly for a few days, we are not now concerning ourselves with either the so-called Pennsylvania rule or the Massachusetts rule. Paraphrasing the language of the court just quoted from *Millen* v. *Guerrard,* we may say, that, no matter what may be the law in respect to other cases, in this case and under this will these corporate disbursements were corpus and not income. In our opinion the cash here involved is in the same legal position as were the new shares of stock involved in *Jackson* v.

*Maddox,* supra; and we adopt, as applicable here, the following from 14 C. J. 831, quoted approvingly in *McHenry* v. *McHenry,* supra: "However, if the action of the corporation in declaring a dividend amounts in substance to a declaration of a stock dividend, its character as a distribution of capital is not affected by the fact that the dividend is in form a cash dividend." See also *Wood* v. *Davis,* 168 *Ga.* 504 (148 S. E. 330). Counsel direct attention to the fact that the trustees paid an income tax on the funds in question. But under the terms of the Federal income-tax law a fund may be taxable as "income" and yet not necessarily be embraced within the meaning of that word as used in this will. Under the Federal law, the fund was to be treated as income if it was paid out of earnings or profits accumulated since February 28, 1913. That Federal rule does not affect us here. Nor do we regard it as important that periodic dividends, treated by the trustees as income and disbursed as such, may have been paid partially out of surplus. Counsel stress this point, but we are not impressed by it. We do not find back of the periodic dividends any corporate resolutions like those which authorized the unusual distributions in question. Those other definite "dividends" even though paid partially from surplus, might very well have been in contemplation by the testator when he used the word "income" in his will. The other disbursements we are sure were not. These extraordinary disbursements are not to be classed as "dividends" at all, in the sense that a "dividend" is usually embraced within the term "income."

We have carefully considered every point made by defendants in their briefs and all the authorities cited. We find no decision which requires a conclusion other than the one we have reached. We do not deem further detailed discussion necessary.

■ What is said above disposes of the main question, and leaves only a few minor points to be considered. Several grounds of the demurrers of defendants were sustained. To the rulings on some of the points the plaintiffs filed exceptions pendente lite. One point sustained attacked the bill as multifarious. The exception to this ruling is well taken. The court erred in sustaining this ground. There was a common nexus. Equity seeks to do full justice; and having all the parties before it, the court should have decided all questions presented, and thus avoid a multiplicity of

suits. It was also error to hold that the superior court had no jurisdiction of the question of compensation; the contention being that that matter should be determined by the ordinary. *Adair* v. *St. Amand,* 136 *Ga.* 1 (6), 9 (70 S. E. 578); *Hosher* v. *Fitzpatrick,* 146 *Ga.* 525 (91 S. E. 780). Code of 1933, §§ 37-404, 113-1522. Another point went to paragraph 16 of the bill, referring to the calculations involved if the $93,675 was classed as corpus or as income. While the item is of small importance, the allegations were indirectly relevant and should not have been stricken. The exceptions pendente lite to the adverse rulings on Berry Fleming's individual demurrer are well taken. The court erred in these rulings.

In the bill of exceptions we find a motion to strike certain portions of the answers, and an amendment to this motion. The order on this motion contains no ruling adverse to the plaintiffs, and the bill of exceptions presents nothing in this connection for the reviewing court to pass on.

The court below should, in the light of what is said above, now inquire into and determine all questions made by the pleadings which have not thus far been decided. Among other items the amount of fees to be allowed counsel for the plaintiffs in this litigation should be fixed, and it should be determined what interests should bear these expenses.

*Judgment reversed, with direction. All the Justices concur, except Gilbert, J., disqualified.*